## GROUB v. BLISH ET AL.

No. 12,102. Filed June 11, 1926. Rehearing denied November 19, 1926. Transfer denied December 1, 1928.]

310

*Charles T. Hanna, Thomas A. Daily* and *Seba A. Barnes* for appellant.

*William F. Peter, Samuel D. Miller, Frank C. Dailey, William H. Thompson, Albert L. Rabb, Thomas D. Stevenson, Perry E. O'Neal* and *Oscar H. Montgomery,* for appellees.

NICHOLS, J.—Action by appellant in two paragraphs of complaint to recover damages for the alleged conversion of certain shares of the corporate stock of the Blish Milling Company, an Indiana corporation. A demurrer for want of facts was sustained to each paragraph of the second amended complaint hereinafter mentioned as the "complaint." Appellant refused to plead over, but elected to stand by her complaint and judgment was rendered against her that she take nothing. The only errors assigned in this court are the action of the court in sustaining appellees' demurrer to the first paragraph of complaint and in sustaining their demurrer to the second paragraph of complaint.

It is averred in the first paragraph of complaint, in substance, that on January 31, 1916, appellant was the absolute owner of 115.1 shares of the capital stock of the Blish Milling Company, a corporation, incorporated in 1886 under the laws of the State of Indiana, of the par value of $100 per share, said ownership being evidenced at said time by certain certificates of stock issued by said corporation to appellant. On said day, of the residue of the shares of the capital stock of said company, Lucy B. Humbert owned 115.1 shares, Maude B. Thompson 115.1 shares, Tipton S. Blish 260.1, Meedy S. Blish 260.1 and John Humbert, a person of unsound mind, $34\frac{1}{2}$ shares, making a total of 900 shares. On said day, appellant and said Lucy B. Humbert, Maude R. Thompson, Tipton S. Blish and Meedy S. Blish entered into a written agreement which is set out at length in the body of the complaint, covering thirty-four pages of the record, and which provided, in substance and effect, that all of said stockholders except John Humbert, who was of unsound mind and not capable of entering into any agreement, agreed to assign their stock in blank to Tipton S. Blish, Meedy S. Blish and J. Louis Davis as depositaries, the same to be held by such depositaries until January 1, 1936, and gave to said depositaries their irrevocable proxy to vote such stock until the year 1936 and as long as it remained on deposit, and gave irrevocable direction to the milling company to pay the dividends to the depositaries. Said depositaries agreed to issue one part represented by participation certificates class "B" for each share of stock so deposited with them and $3\frac{1}{3}$ parts represented by participation certificates class "A," for each share of stock so deposited. Out of the earnings of said business, it was agreed that $6 per year should be paid from January 1, 1916 to January 1, 1936, on each share of participation certificates class "A," and, after this payment, the depositaries agreed to

set aside $8,400 each year in a sinking fund which, with accumulations, was to be used for the redemption and retirement of all participation certificates class "A," on January 1, 1936, by paying to the holders of such certificates $100 for each and every equal part represented by said certificates class "A." After these payments and the payment of $500 per year to each of the depositaries, the holders of the class "B" certificates were to receive the balance. If nothing was earned, no payments were guaranteed. After the redemption of the participation certificates class "A," the stock in said milling company was to be delivered to holders of the class "B" certificates, together with all other cash securities on hand. Contemporaneously with the execution of this contract, a second contract was entered into, which is set out at length in the body of the complaint, and which provided that, in order that said Meedy S. Blish and Tipton S. Blish might become the sole owners respectively of all the participation certificates class "B," appellant, Lucy B. Humbert and Maude R. Thompson agreed to exchange all of their participation certificates class "B" with Meedy S. Blish and Tipton S. Blish for an agreed amount of participation certificates class "A." Two years after the date of these contracts, a third contract was entered into, which is set out in the body of the complaint and which provided for the increase of the dividends on participation certificates class "A" from $6 to $10 per year. Pursuant to said first agreement, the parties delivered their respective certificates of stock to said depositaries, who proceeded to act thereunder. Said J. Louis Davis, prior to December 29, 1921, resigned, and, after the commencement of this action, the said Meedy S. Blish died, and Belle S. Blish, the executrix of his last will and testament, was substituted as party defendant. It is averred that appellees are now in the possession of all of said property

rights and authority so delivered to the said Tipton S. Blish, Meedy S. Blish and J. Louis Davis, and are holding the absolute possession of appellant's certificates and shares of stock, claiming and asserting the right so to do solely under and by reason and force of said agreements and not otherwise; that each and all of said agreements were made and entered into without any consideration whatsoever therefor, and were and are wholly void; that the agreements were not ratified by the stockholders; that on December 29, 1921, appellant notified the said Meedy S. Blish and Tipton S. Blish that said agreements were void and demanded of them the return of her 115.1 shares of the capital stock of said company, and the certificates therefor, together with the accrued dividends thereon not accounted for; that the said Blishes, and each of them, claimed said certificates and the right of possession thereof under said contract, and refused the return of the same to appellant thereby converting them to their own use; that said shares of stock and certificates were of the reasonable value of $400,000 for which amount appellant demands judgment and all proper relief.

The facts averred in the second paragraph of complaint are substantially the same as in the first paragraph, and, in addition thereto, there are allegations of confidential relationship between appellant and Tipton S. and Meedy S. Blish, of whose last will appellee Belle Blish is executrix, by reason of family, business and blood relationship, and of the abuse of that confidential relationship, and allegations that Tipton S. Blish and Meedy S. Blish fraudulently represented to appellant that the stock and business of the milling company was of the value of $390,000, whereas, its true value was $1,500,000, thereby inducing appellant to enter into said contracts. It is appellant's contention that the agreements embodied in each paragraph of the complaint,

and by which the depositaries got possession of the certificates, were absolutely void, and gave the depositaries no right to retain them when demand for their return was made. Appellant says that the agreements were void for each of the following reasons: (a) Because they violate §§4932 and 5508 Burns 1926, §4046 and §5071 Burns 1914, which give each stockholder in an Indiana corporation one vote for each share of stock, and are against public policy; (b) because they suspend the absolute ownership of personal property for longer than lives in being, in violation of §12171 Burns 1926, §9723 Burns 1914; (c) because they provide for an accumulation of personal property in violation of §12172 Burns 1926, §9724 Burns 1914; (d) because said Tipton S. Blish and Meedy S. Blish contracted with themselves; and (e) because said contracts, in effect, provide for the issuance of illegal preferred stock.

These in their order:

Section 4046, *supra*, provides that, "Each stockholder shall have one vote for each share owned and held by him for ten days previous to the meeting of the corporation."

Section 5071 provides that, "Absent voters may vote by proxy, and each share of stock shall entitle the owner thereof to one vote."

We cannot agree with appellant's contention that the transaction here involved is in any sense violative of either of the above-quoted sections of the statute. The contracts were simply agreements, in effect, on the part of appellant and two other stockholders to sell their stock to Tipton S. and Meedy S. Blish, and of the latter to buy the same, upon specified terms, the carrying out of which covered a period of years from 1916 to 1936. The selling parties were minority stockholders, and the purchasing parties were majority stockholders, and, as such, were, at and before the time of the

execution of the agreements, fully able to control the policy and management of the company. The execution of the agreements by which the depositaries were given irrevocable authority to vote appellant's stock did not give them any power over the corporation that they did not already possess, and did not create a voting trust that was invalid under the facts and circumstances of this case. The primary object of a voting trust is to control the corporate business. As defined by Bouvier, it is the accumulation, in a single hand, or in a few hands, of shares of corporate stock belonging to many owners in order thereby to control the business of the company. These agreements did not accomplish this purpose, for Tipton S. and Meedy S. Blish already were in position to control the management of the corporation.

Appellant and her associates in this sale did not surrender all voting control over the shares of stock which they transferred to the depositaries. Provision is made in the agreement that meetings of the certificate holders may be called at any time by their own action, and a stated annual meeting is provided for on the first Monday in December of each year, at 10 o'clock a. m., in the office of the Blish Milling Company, and it is further provided that the holders of the participation certificates may direct the action of the depositaries upon any corporate matter in which the majority stockholders in Indiana corporations may lawfully act, and the depositaries expressly agreed and bound themselves to vote as they might be directed from time to time and not otherwise; but, as majority stockholders, the Blishes could direct the manner in which the vote by the depositaries should be cast. When, pursuant to the terms of the agreements, appellant sold, assigned and transferred to the depositaries her shares of capital stock and executed a proper written assignment thereof, she was no longer a stockholder, but

the depositaries were the holders of the stock for the contemplated purpose eventually of consummating the sale of the same to the Blishes. During the time they were holding such stock, they had active duties to perform with reference thereto; their holding the same did not create simply a "dry trust," but an active one. Among their duties which they had to perform was that of collecting the dividends from time to time and distributing the same to the holders of the participation certificates, after setting apart a certain part thereof for a sinking fund which was to be so handled that it, together with its accumulations, should be sufficient to redeem and retire participation certificates class "A" on January 1, 1936, at which time, the holders of participation certificates "B" were entitled to the shares of stock. With these duties to perform, it clearly appears that the depositaries had beneficial interests in the stock so deposited with them which gave them a valid right to vote the same under the direction of the holders of the participation certificates. The case of *State, ex rel.,* v. *Anderson* (1903), 31 Ind. App. 34, 67 N. E. 207, so confidently relied upon by appellant, is not in point under the circumstances of this case. In that case, there was an attempt made by the corporation, in its articles of incorporation, permanently to deprive the stockholder of his right to vote and to perpetuate in office, regardless of the will of the stockholders, a board of directors and a president named in the articles, while in the present case there was a voluntary transfer upon the part of appellant as a stockholder, of her shares of stock, and of her right to vote the same to the depositaries, reserving to herself the right to direct the manner in which the votes should be cast, and, before the agreement was entered into, stockholders, who became, under the terms thereof, two of the depositaries, already had a controlling majority of the stock of the corporation.

Nor can appellant prevail in her contention that the contracts are void because they each violate the Indiana statute which makes unlawful the suspension of the absolute ownership of personal property for a longer period than lives in being at the time of the execution of such contracts, being §12171 Burns 1926, §9723 Burns 1914. Absolute ownership of personal property is suspended only, under the authorities, when no person is in existence who by his act, or when no persons are in existence who by their joint acts, can confer an absolute title thereto. In *In re Allen's Will* (1920), 111 Misc. Rep. 93, 181 N. Y. Supp. 398, the court says: "The test of the suspension of the absolute ownership of personalty is the same as the test of power of alienation of realty. The ownership is suspended only so long as there are no persons in being who by their joint act can confer an absolute title to the personalty and to the proceeds of its sale or distribution." It will hardly be contended that in the instant case all of the parties, or their successors in title or office, might not, by joint agreement, abrogate the agreements here involved, and join in a transfer of the deposited stock that would be wholly valid and effective. The principle is thus expressed in *Williams* v. *Montgomery* (1896), 148 N. Y. 519, 43 N. E. 57, a case also relied upon by appellant: "Where there are living parties who have unitedly the entire right of ownership, the statutes have no application. . . . The ownership is absolute whether the power to sell resides in one individual or several. If there is a present right to dispose of the entire interest, even if its exercise depends upon the consent of many persons, there is no unlawful suspension of the power of alienation. The ownership, although divided, continues absolute."

Appellant next contends that the contracts pleaded violate §12172 Burns 1926, §9724 Burns 1914, which pro-

vides that any provision for the accumulation of interest or income of money, or other personal property, by any conveyance or will, shall be void, with exceptions as to benefits for minors. This contention is made with reference to the provision of the agreement of January 1, 1916, that when dividends upon the deposited shares are paid to the depositaries, the distribution of the same provides, among other things, for a specified sum to be put into a sinking fund to be used on January 1, 1936, for the redemption and retirement of class "A" certificates heretofore mentioned, by the payment for each part represented by such certificates, of $100, together with any arrears on account of the annual cumulating payments. That the obligation to make such payment for the retirement of class "A" certificates is a liability against the depositaries requiring them to pay a definite amount to the holders of the certificates cannot be denied. The amount to be paid to the holders of such certificates was a debt to be discharged by the depositaries from the sinking fund thus accumulated for that purpose. That the creation of such funds for the discharge of an indebtedness has been a custom in commercial transactions for many years is a matter of common history. It has been a method of accumulating funds for the purpose of payment of debts adopted by the United States Government. *Sinking-Fund cases* (1878), 99 U. S. 700, 25 L. Ed. 504; and has enabled debtors to have funds with which to discharge their obligations when due which, often, they would not have had except for the provision for such a fund. There is nothing in provisions for the accumulation of such funds that is against public policy unless it must be that such a provision is in contravention of the statute. §12172 Burns 1926, §9724 Burns 1914. In order that we may determine as to whether the accumulation of a sinking fund for the purpose of discharging an obligation when

due is prohibited by said statute, it is well for us to inquire as to the legislative intent in passing the same. The section referred to was copied from the New York statute, but is traceable to the English statute known as the "Thellusson Act," recognized by the Supreme Court of this state in *Porter* v. *Union Trust Co.* (1915), 182 Ind. 637, 644, 108 N. E. 117, where the court says: "In Indiana, a testamentary provision for the accumulation of income from personalty, to commence at testator's death, is void unless for the benefit of a minor, and to terminate with the expiration of the minority. 2 R. S. 1852 p. 245, §9724 Burns 1914. The origin of this limitation is traceable to the will of an English merchant who died in 1797. This will devised property worth about $3,000,000 to trustees, to accumulate the income during the lives of all of his sons, grandsons and grandson's children living at his death, and then, at the death of the survivor, to transfer the property to the three living, oldest, male descendants of his three sons, and, failing them, to the Crown of England for the sinking fund. It was then estimated that the trust might last for 75 years and with most skillful management, the total accumulation could reach $125,000,000. It was held, however, that the trust did not conflict with the then existing rule against perpetuities. *Thellusson* v. *Woodford* (1798), 4 Ves. 227. The danger to public interests of such possible accumulation caused Parliament to promptly enact the law of 39 and 40 Geo. III, ch. 98, popularly called the Thellusson Act, and our statute (§9724 Burns 1914, *supra*) is the outgrowth of the legislation."

It thus appears that the origin of the act was in the purpose to prevent the accumulation of estates in trust for the use of future generations, of necessity, against the public weal, as well as against the best interest of the intended beneficiary, and not to prevent the accumu-

lation of a fund for the purpose of paying a legitimate debt as in this case. The authorities cited by appellant do not involve cases, such as here; in none of them was there a debt contracted in the sale of property with a provision by which the debt should be paid. During the accumulation of the fund with which to retire appellant's class "A" certificates, without risk or responsibility in the operation of the milling plant, she is to receive, under the agreements as modified by the third agreement, $10 for each part represented by the certificates held by her, or about $33 per share of stock, and finally about $333 for each share of her stock, with what, in effect, is a first lien on the whole milling plant for the payment of both the annual dividends and the purchase price of the stock. We do not see that such a transaction is violative either of statutory law or the principles of common equity. *Williams* v. *Montgomery, supra,* and *Toms* v. *Williams* (1879), 41 Mich. 552, 2 N. W. 814, are two cases cited by appellee from states with a similar statute to the Indiana statute, which seem fully to sustain appellees' contention.

But appellant argues that the contracts are void because the same parties are both obligors and obligees. In presenting this question, it seems to the court that appellant misconceives the nature of the contract into which she entered. Of course, it is the law, as well as common sense, that a party cannot enter into a contract with himself. But the contract here involved, when rightly interpreted, does not present such a situation. If the contracts entered into were joint contracts so that appellant could not maintain her action except jointly with the Blishes and against them, a different question might be presented. However, it clearly appears that the contracts under consideration were several, or joint and several contracts. It is ex-

pressly provided in the contract of January 1, 1916 that "the parties of the first part do hereby severally sell, assign, and transfer unto Meedy S. Blish and Tipton S. Blish and J. Louis Davis as depositaries," etc., and again that "each of the parties of the first part agrees, for and on his own behalf, to deliver forthwith to the depositaries his certificate or certificates for his said shares duly endorsed in blank for transfer"; and, in the contract of January 31, 1916, it is provided that "the parties hereto do hereby jointly and severally covenant and agree each with the other," etc. The authorities cited by appellant, and upon which she relies, involved actions upon joint covenants, and, in that regard, are clearly distinguished from the contracts in suit. The distinction is clearly made in one of the cases cited by appellant, *Ellis* v. *Kerr* (1910), 1 Ch. (Law Reporter) 529, a case involving a joint covenant, the court distinguishing it from the case of *Rose* v. *Poulton* (1831), 2 B. & A. (Eng.) 822, where the covenants were joint and several. The controlling elements of the contract here involved are to be determined, not alone or chiefly from the form of the contract entered into, but from the end to be accomplished thereby. Clearly, in effect, it was a contract between appellant and the four other persons named as parties of the first part. Each of the five persons agreed with the other four to deposit the shares of stock so owned by such person for the purpose of carrying out the terms of the agreement into which they had entered. Having entered into their agreement for the disposition of the stock of the milling company, and provided the terms and stipulations by which the end to be accomplished should be reached, the selection of the ones who should act as the depositaries was a secondary consideration, in the accomplishment of the primary purpose, and the depositaries, in accepting the stock as such depositaries, agreed separately and severally with each of the owners

of the stock to carry out the terms and stipulations of the agreement in order to the accomplishment of its purpose. They were, in effect, but the agents or trustees of the respective stockholders. The principle that must control under such circumstances is thus stated with reference to trusts in 39 Cyc 248: "A *cestui que trust* is not absolutely prohibited from occupying the relation of trustee for his own benefit, and especially is this so when he is but one of several trustees or where he is a trustee for himself and others." Numerous authorities are cited to sustain the principle.

In *Burbach* v. *Burbach* (1905), 217 Ill. 547, 75 N. E. 519, the court says: "The provisions of the will are not void on the ground that the three trustees are also beneficiaries. Whatever may be said as to the fitness of trustees to take property in trust for themselves, they are not necessarily and in all cases incapable of doing so, and where one is a trustee for himself and others that fact does not defeat the trust." Citing Perry, Trusts §59.

Finally appellant contends that the first paragraph of complaint is good for the reason that the scheme for the participation certificates "A" and "B" is a plain evasion of §4992 Burns 1926, §5093 Burns 1914, for the reason that such certificates class "A," as appellant contends, have all the attributes of preferred stock, certificates class "B" have all the attributes of common stock, that the first-named certificates are issued in greater proportion than two to one allowed by the preferred-stock statute, and that, therefore, they are void. But we have to say that there is, as we view it, but little force in this argument. The right to issue preferred stock is a statutory attribute of certain corporations. The act here involved was not the act of any corporation, but a private agreement between the stockholders with reference to the disposition of their stock. The participation certificates "A" and "B"

were, in no sense of the word, shares of a corporation, and there was no attempt whatever to increase the number of shares of the common stock or to issue preferred stock. Whatever may have been the effect of the agreement entered into upon the stockholders, the Blish Milling Company, as such, was not affected thereby.

While the theory of the first paragraph of complaint is that the contracts involved were void, the theory of the second paragraph is that the contracts were voidable only, and that appellant had taken the proper steps to avoid them. She might have affirmed the contracts and sued for damages because of the alleged fraud, leaving appellees in the possession of the shares of stock. But instead, she sought to avoid the contracts, and to reclaim the stock, and, failing in this, she sued for damages for conversion. She undertook to rescind the contracts, but she did not take the necessary steps to accomplish that purpose. She made demand for the return of her shares of stock, but not until five years after the contracts were entered into, and there is no averment of excuse for the delay. She did not restore, or offer to restore, the certificates class "A" that had been delivered to her in carrying out the terms of the agreements. The rule of law that must control under such circumstances is thus stated in *Adam Meldrum, etc., Co.* v. *Stewart* (1901), 157 Ind. 678, 61 N. E. 1002, 87 Am. St. 240. It is a familiar rule that a contract induced by fraud is not void, but voidable only at the option of the party defrauded. It rests solely with the defrauded party to say whether or not the contract shall stand, and until repudiated by him it is valid. He may abide the contract and seek redress in damages; or, if he acts within a reasonable time after the discovery of the fraud, he may rescind the contract, and reclaim his property. But if he elects to rescind there must be a complete restoration of everything of value the party

defrauded has received under the contract. He will not be permitted to undo the contract while retaining the money, or other valuable thing, delivered him under its terms." It is true that appellant has averred, as an excuse for not tendering the return of certificates class "A," the conclusion that such certificates were wholly worthless, but this general averment of the pleader's conclusion cannot prevail against the specific averments of facts which show conclusively that the certificates did have a substantial value. Appellant was bound to tender them back as a necessary step in her attempted rescission, and, failing in this, she had no right to the return of her shares of stock, even if otherwise entitled to them, and, as appellee's possession was not wrongful, appellant could not maintain her action for conversion.

The court did not err in sustaining appellees respective demurrers to the first and second paragraphs of complaint. The judgment is affirmed.

Enloe, C. J., dissents.

## DISSENTING OPINION.

ENLOE, C. J.—I find myself unable to concur in the majority opinion herein. The contract involved in this case, the leading features of which are set forth in the principal opinion herein, simply presents, to my mind, a situation where certain named stockholders of a corporation turn over to certain named persons, two of whom are also stockholders in said corporation, their certificates of stock, under an agreement with such bailees that they, the said bailees, who in said contract are called "depositaries," shall have full control and management, for a specified time, of the affairs of said corporation, and for their services in that behalf should receive, out of the net earnings of the corporation, each the sum of $500 annually, the said bailees—agents,

for such they were—agreeing that, OUT OF THE NET EARNINGS of said corporation they would pay to each of said bailors so depositing their stock with them a certain specified rate of dividend on their said stock, out of the net earnings of said company. The agreement also provided that the bailees should give to each bailor a certificate, designated class "A," representing the face value of stock deposited, and should also issue certain certificates, designated as class "B," representing three and one-third times the face value of such stock, which last certificates were to be the property of the said two bailees who were stockholders in said company.

The agreement also provides for the creation, OUT OF THE SURPLUS EARNINGS of said corporation, of a redemption fund, out of which, at the end of the period named in said contract—1936—said stock so deposited is to be redeemed, or rather the class "A" certificates issued in lieu thereof were to be redeemed and cancelled, and that thereafter the said two bailees who are stockholders, shall be the sole owners of all the stock so deposited.

The writer of this opinion has read said contract, and reread it, but has been entirely unable to find anything therein obligating these said "depositaries," as they are called, to pay any money whatever, or to assume any liability under said contract, personal to themselves. The money earned by said corporation, after the payment of expenses of operation, was, in reality—so far as these bailees are concerned—the money of the stockholders; it belonged to them. The dividends to be paid to these stockholders, as per the terms of said agreement, were to be paid out of this money, IF EARNED; otherwise, nothing was due; the money to be set aside for the "redemption fund," out of surplus earnings, was also the money of the stockholders; they were to be paid off and their stock cancelled, by the payment to them of

their own money, if earned, otherwise the transaction failed because of a want of funds in the "redemption fund," denominated in said contract as "reserve fund," the bailees having assumed no personal obligation in that regard whatever, yet, if the business should prosper, they—two of them—should thereby become the owners of said stock. Not only this, but if, after the payment of the dividends specified and the final payment out of the said reserve fund of the face value of said stock, there yet remained a surplus of such net earnings, the said two depositaries were to have and receive, take as their own, all such surplus of net earnings.

To my mind, the said agreement is not only without any legal consideration to support it, but, to allow it to stand, would be to sanction the perpetration of a deliberate fraud upon the appellant, who has, according to the averments of the complaint, repudiated the same and demanded that her said stock be returned to her. As I view it, the judgment in this case should be reversed.