## RICHARD S. JACKSON ET AL. *v.* LIONEL S. JACKSON ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued March 13—decision released June 19, 1979

*George C. Hastings,* with whom were *Gordon B. Spivack, Robert Ewing,* and, on the brief, *Stephen M. Hudspeth,* of the New York bar, for the appellants (plaintiffs Rose Jackson Sheppard et al.).

*John H. Weir,* with whom were *Frederick L. Comley* and *Curtiss K. Thompson,* for the appellees (defendants).

BOGDANSKI, J.   On November 7, 1956, the late John Day Jackson, executed a trust indenture setting up the John Day Jackson trust, which trust is the subject of the present appeal.   The trust indenture provided that the trust was to be administered by two family trustees and one nonfamily trustee.   The trust, which consists of seven separate trust funds, one for each of the settlor's children, has now been in continuous operation for over eighteen years.   The principal asset of the trust is the stock of the Register Publishing Company, a Connecticut corporation established by the settlor in October, 1956, to carry on the business of publishing the two newspapers owned by him, i.e., the New Haven Register and the New Haven Journal Courier.   Over time, Jackson transferred his shares of the Register to the trust and the trust now owns all but two of the issued and outstanding shares of the voting stock and all of the outstanding shares of nonvoting preferred stock of the Register.   The assets of the trust also include shares of stock of various corporations traded on the New York Stock Exchange, a few municipal bonds and a small amount of cash.[1]

The plaintiffs are certain beneficiaries of the trust.   The defendants are Lionel S. Jackson, a son of the settlor, a beneficiary of one of the seven trust funds, and one of the family trustees; Lionel S.

---

[1] In January, 1959, John Day Jackson transferred to the trust about $5,000,000 worth of other assets.   These assets consisted for the most part of common stock of corporations listed on the New York Stock Exchange, some municipal bonds and some cash.

Jackson, Jr., the son of Lionel S. Jackson and the second family trustee; Attorney Carter LaPrade, the current nonfamily trustee; and the Register Publishing Company.

In the second count[2] of their substituted complaint, the plaintiffs alleged that the Jackson trust constituted a voting trust, that it has continued in existence for a period longer than ten years, and that it is therefore violative of § 33-338 of the General Statutes. The plaintiffs requested an order from the court terminating the power of the trustees to vote the stock of the Register and vesting such power in the beneficiaries. The trial court concluded that the trust was not a voting trust and that the plaintiffs were not entitled to an order vesting the voting power in the beneficiaries. From that judgment the plaintiffs have appealed to this court, assigning error in the court's conclusions.

The plaintiffs claim that the Jackson trust, which vests in its trustees the power of voting stock held by the trust, is designed to centralize and perpetuate family control and management of the Register and is, therefore, a voting trust within the meaning of § 33-338 of the General Statutes.

The defendants maintain that the trust is not a voting trust but is, rather, an ordinary irrevocable inter vivos trust, that the ten-year limitation contained in § 33-338 does not apply to this trust and that the plaintiffs are accordingly not entitled to an order terminating the voting rights of the trustees and vesting such rights in the beneficiaries.

---

[2] The first count of the complaint alleged that the election of Lionel S. Jackson as president of the Register Publishing Company was improper. That count was resolved, however, when the parties agreed to a consent judgment ordering the holding of a substitute annual meeting of the Register's stockholders.

Thus, the sole issue on this appeal is whether the trust established by John Day Jackson is a voting trust within the meaning of § 33-338 of the General Statutes.

In 1891, in the *Shepaug Voting Trust Cases,* 60 Conn. 553, 579–80, 24 A. 32, a court of this state concluded that voting trusts were void, as against public policy,[3] on the ground that such trusts involve a separation of voting rights from stock ownership.

In 1949 the legislature enacted the predecessor of § 33-338 in order to modify the common law of this state and expressly to permit the creation and use of voting trusts, except in the case of state banks and trust companies, industrial banks, buildings and loan associations, insurance companies and surety or indemnity companies. The statute was subsequently expanded to permit voting trusts of the shares of any corporation.

Section 33-338 presently provides that "(a) One or more shareholders of a corporation may by agreement in writing deposit shares with or transfer shares to a voting trustee or voting trustees for the purpose of vesting in such trustee or trustees, or a majority of such trustees, the right to vote thereon for a period not exceeding ten years, upon the terms and conditions stated in such agreement. . . ." Subsections (b) through (d) set forth the procedure by which such trusts are to be created. Subsection (e) of the statute provides that "[t]his

---

[3] The argument that public policy somehow precludes the separation of voting rights from the other incidents of stock ownership has now lost much of its force, a result of the widespread development and acceptance, both statutory and judicial, of nonvoting stock, stock with limited voting rights, proxies (irrevocable and revocable), shareholders agreements and voting trusts themselves. See Cavitch, 5A Business Organizations § 111.02.

section shall be construed to be permissive and shall not be held to invalidate any voting or other agreement among shareholders which is otherwise not illegal." From the above language it is apparent that the legislature in enacting § 33-338 did not intend to regulate all trusts in which shares of stock are held and voted by trustees. By its terms, § 33-338 is intended to apply only to "voting trusts" as that term has traditionally been defined in the law.

A voting trust as commonly understood is a device whereby persons owning stock with voting powers divorce the voting rights thereof from the ownership, retaining the latter in themselves while transferring the former to the voting trustees in whom the voting rights of all depositors in the trust are pooled. *Smith* v. *Biggs Boiler Works Co.,* 33 Del. Ch. 183, 190, 91 A.2d 193 (1952).

The criteria for distinguishing voting trusts from other trusts in which shares are held and voted by trustees are generally stated to be as follows: (1) the voting rights of the stock are separated from the other attributes of ownership; (2) the voting rights granted are intended to be irrevocable for a definite period of time; and (3) the principal purpose of the grant of voting rights is to acquire voting control of the corporation. *Tankersley* v. *Albright,* 374 F. Sup. 538, 547 (N.D. Ill. 1974) ; 5 Fletcher, Corporations (1976 Rev. Ed.) § 2075; Cavitch, 5A Business Organizations § 111.01 n.1.

In a traditional voting trust the powers of the trustees are quite limited, with the trustees receiving merely the right to hold the shares transferred to them and to vote those shares as directed in the trust agreement. Upon the termination of the trust

the trustees are required to return the shares so held to the true owners, i.e., the shareholders-settlors.

In the present case when the settlor, who was the sole shareholder of the Register, transferred his stock in the Register to the trust he irrevocably gave up all the rights and incidents of ownership in the stock so transferred, retaining no interest, legal or equitable, in himself. All transfers were absolute; the trust, as established, was irrevocable; and there was no provision in the trust indenture that the shares were ever to be returned to the settlor.

The trustees of the Jackson trust were given much more than simple legal title and power to vote the shares of any stock held by the trust. By the terms of the trust indenture they were also given full power and authority to hold and manage the assets of the fund and to sell and exchange or otherwise dispose of all or any part of such assets; to invest and reinvest the assets of the fund in stocks, bonds, securities or any other property, real or personal; to hypothecate all or any part of the assets of the fund; to vote any corporation stock held in the fund by proxy or other representative; to pay out the net income of the fund to the children of the settlor until their death, with remainder to their children upon termination of the trusts pursuant to article IV of the trust indenture. Those trustees, in short, were given virtually all the powers which may presently be granted to trustees under the Fiduciary Powers Act. General Statutes §§ 45-100d–45-100g.

The plaintiffs, on the other hand, as beneficiaries of the trust, received neither title to nor any other legal rights in any of the specific assets which at

any time may make up the corpus of the trust. As beneficiaries the plaintiffs received only an equitable interest in the principal or corpus of the trust. For example, while the beneficiaries have the right to receive income from the trust, they have no right to the dividends which are declared by a corporation, shares of whose stock are held by the trust. The plaintiffs are not, therefore, in any sense of the term, "shareholders" of the Register, or of any corporation whose stock is held by the trust.

From the preceding it is apparent that the separation of voting rights from the other incidents of stock ownership, which is a major characteristic of a voting trust, is not found in the trust set up by John Day Jackson.

It has often been stated that the primary object of a voting trust is to acquire control of a corporation. 5 Fletcher, Corporations (1976 Rev. Ed.) § 2075. As traditionally defined, a voting trust is "the accumulation in a single hand or in a few hands of shares of corporate stock, belonging to several or many owners, in order, thereby, to control the business of the company." Bouvier, Law Dictionary (1934 Ed.); *Bankers' Fire & Marine Ins. Co.* v. *Sloss,* 229 Ala. 26, 155 So. 371 (1934); see also Black, Law Dictionary (Rev. 4th Ed. 1968). At the time this trust was established, the settlor owned all but two of the 30,011 shares of the voting stock of the Register. As sole shareholder, Jackson was already in complete control of the Register and had no need to combine with other shareholders into a voting trust in order to acquire control of the Register.

In *Groub* v. *Blish,* 88 Ind. App. 309, 152 N.E. 609, 611, 153 N.E. 895 (1926), an Indiana court held that

an agreement between minority stockholders to sell their stock to the majority stockholders and to deposit the stock with the latter, while granting them irrevocable voting rights, was not a voting trust on the ground that the majority stockholders already were in a position to control the management of the corporation. In *Alderman* v. *Alderman,* 178 S.C. 9, 21, 181 S.E. 897 (1935), the South Carolina Supreme Court noted that "the whole theory of voting trusts is built upon the idea that a group or a portion of the stockholders of a corporation unite and execute an instrument to a trustee for the purpose of voting and controlling the policies of the corporation, but in no definition, nor reported case, do we find the entire stock of the corporation pooled in the same trustee or trustees."

The plaintiffs have cited no case, nor has this court been able to find any reported case, in which a trust, established by a settlor who was the sole or controlling stockholder of a corporation, has been held to be a voting trust.

In the preamble to the trust indenture the settlor expressed his reasons for establishing the trust: "Whereas, settlor believes the newspaper New Haven Register has developed under his ownership into an institution of civic importance operating for the improvement of the governments of the city, state and nation and for the welfare of their citizens, and he is conscious of his obligation to preserve it as such an institution; and Whereas if it is to remain an institution powerful enough to speak forthrightly for the public good and to defend it against the impact of unwise political and economic doctrines, settlor recognizes that it must have centralized ownership and control, a wise and competent man-

agement, and a sound financial position; and Whereas, to discharge his obligation settlor has recently transferred ownership of the newspaper to a corporation, and he believes the establishment of a trust to which he will from time to time transfer stock of such corporation so that ultimately the trust will control such corporation, will further conduce to the discharge of his duty and the attainment of his objective."

The "whereas" clauses quoted above, which set forth the wishes and desires of the settlor in connection with the trust being established, reveal that the real purpose of this trust was not the running of a business or the management of a corporation; nor was it the production or accumulation of income for disbursement to the income beneficiaries; nor was it even the preservation of a large fund for the remaindermen. The real purpose of this trust was rather the propagation and perpetuation of a certain political and economic philosophy.

It is reasonable to assume that the settlor, during his lifetime, endeavored to inculcate his philosophy in his children and hoped, by means of the trust, to provide his children with the means of propagating and perpetuating that philosophy and defending it against the impact of what he considered to be unwise political and economic doctrines. The vehicles which the settlor used during his lifetime to spread his philosophy were the two New Haven newspapers which he owned. That he hoped that the Register would continue to serve that purpose under his sons is also apparent.

The clauses of the trust indenture set forth above were, however, merely precatory. In the trust indenture proper, the trustees are expressly given the

power to sell, exchange, or otherwise dispose of all or any part of the property transferred to them, i.e., the stock of the Register, if they, in relying upon their own views as to future prospects of such newspaper under existing or new management, deem this to be desirable. Since the trustees may *at any time* sell the stock of the Register, the trust indenture cannot be said to be an instrumentality designed to perpetuate centralized family control of that corporation.

From the preceding discussion, it is clear that the trust established in 1956 by the settlor is not, under any traditional definition of the term, a voting trust. To hold that the Jackson trust is a voting trust would require this court to expand the definition of that term to the point where the term voting trust would include virtually any trust which contains shares of stock and permits the trustees to vote such stock. As noted earlier, there is specific language in the voting trust statute, § 33-338, requiring that it be interpreted permissively so that other kinds of trusts and shareholder agreements, otherwise legal, will not be invalidated solely by reason of its provisions.

We conclude, therefore, that the trial court did not err in finding that the John Day Jackson trust was not a voting trust within the meaning of § 33-338, and that this trust is not subject to the ten-year limitation set forth in § 33-338 of the General Statutes.

There is no error.

In this opinion the other judges concurred.